**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES SUGAR CORPORATION,

     Plaintiff,

-v-                                                 Civil Action No.

UNITED STATES ARMY CORPS OF
ENGINEERS, CHRISTINE E. WORMUTH,
in her official capacity as Secretary of the
Army, JAIME A. PINKHAM, in his official
capacity as Assistant Secretary of the Army
(Civil Works), LIEUTENANT GENERAL
SCOTT A. SPELLMON, in his official
capacity as Commanding General and Chief of
Engineers for the United States Army Corps of
Engineers; COLONEL ANDREW D. KELLY,
in his official capacity as Commanding District
Engineer for the United States Army Corps of
Engineers, Jacksonville District,

     Defendants.

_____/

## COMPLAINT

### INTRODUCTION

1.     Plaintiff, United States Sugar Corporation ("U.S. Sugar"), sues Defendants, the

U.S. Army Corps of Engineers ("Corps"), Secretary of the Army Christine E. Wormuth, in her

official capacity, Assistant Secretary of the Army (Civil Works), Jaime A. Pinkham, in his official

capacity, Lieutenant General Scott A. Spellmon, in his official capacity, and Colonel Andrew D.

Kelly, in his official capacity (collectively, the "Federal Defendants") for the Corps' failure to

adhere to the Savings Clause under the plain language of the Water Resources Development Act

of 2000 ("WRDA 2000") in its implementation of one of the projects associated with the

Comprehensive Everglades Restoration Plan ("CERP"), known as the Central Everglades

Planning Project ("CEPP"), which includes two components, the A-2 Stormwater Treatment Area ("A-2 STA") and the A-2 Reservoir (collectively, the "CEPP A-2 Component").

2.      The federal government's initiation of CERP promised, through the Savings Clause of WRDA 2000, that the water supply of urban and agricultural entities would not be eliminated or transferred unless additional sources of water could be found as a replacement.   In its implementation of the CEPP A-2 Component, the Corps violated this requirement of WRDA 2000. This Complaint provides a summary of the relevant facts related to the development of the CEPP A-2 Component, and then asserts three counts.   Count 1 seeks a declaration that the Corps has violated WRDA 2000, Count 2 demonstrates a violation of the Federal Administrative Procedures Act ("APA") as a result of the violation of WRDA 2000, and Count 3 shows the Corps' review under the National Environmental Policy Act ("NEPA") was flawed.   In sum, the law and the facts demonstrate that the Corps has broken the promise made by Congress in WRDA 2000 to Florida's urban and agricultural water suppliers.

3.      The Corps' unlawful decisions are contained in the following agency actions:

a.   the CEPP Environmental Impact Statement and August 31, 2015 Record of Decision (the "2015 CEPP EIS");

b.   the 2018 Post-Authorization Change Report ("2018 PACR");

c.   the April 17, 2020 Record of Decision supporting the A-2 STA 404 Permit, SAJ-2018-03427 ("A-2 STA 404 Permit");

d.   the second Final Environmental Impact Statement for the Central and Southern Florida, Everglades Agricultural Area (EAA) Reservoir and Stormwater Treatment Area (STA), Florida, and the May 15, 2020 Record of Decision ("May 2020 FEIS"); and

    e.   the April 30, 2021 Project Partnership Agreement ("PPA").

These actions are collectively referred to herein as the "CEPP A-2 Component Authorizations".

    4.     A map depicting the CEPP A-2 Component features is below:



Figure ES-1. Preferred Alternative – Alternative 3 - Corps Recommended Plan

    5.     U.S. Sugar has been a long-standing supporter of the CERP plan to restore the Everglades, having been a key stakeholder involved in the original development of CERP, which was codified in WRDA 2000.

6.      Today, U.S. Sugar remains a staunch supporter of CERP and CEPP, but it has witnessed a failure by the Corps to adhere to WRDA 2000's requirements that the Corps protect agricultural and urban water supply while CEPP is implemented.

**PARTIES**

7.      Plaintiff, U.S. Sugar, owns and farms approximately 245,000 acres of farmland in Glades, Hendry, Palm Beach and Martin counties.  U.S. Sugar grows sugarcane, oranges, sweet corn, and winter vegetables, relying on water from Lake Okeechobee ("the Lake") to grow its crops.  Dependent on weather and growing conditions, U.S. Sugar produces over 8 million tons of sugarcane each year, providing approximately 10 percent of all sugar produced in America. In 2020, U.S. Sugar's food production included 145 million ears of sweet corn (2.2 million crates), 24 million pounds of green beans, 26 million heads of lettuce, 78 million pounds of water melon, citrus for 150 million glasses of premium Florida orange juice and nearly 1.8 billion pounds of pure cane sugar. U.S. Sugar's food production provides critical fresh fruit and vegetables to much of the United States during the winter months when it is impossible for other areas to grow fresh food crops. Sugar produced by U.S. Sugar is used by food manufacturers in the United States to make bread, canned fruits and vegetables, juices, beverages, cereals, cakes, and ice cream, to name a few.  U.S. Sugar has a protectable and longstanding right under state law to the beneficial use of water from the Lake to irrigate its farmlands, operating under lawfully issued consumptive use permits.

8.      U.S. Sugar also has a procedural interest in the Corps complying with its legal obligations under NEPA and the APA and suffers injury when the Corps fails to do so.  As a result, U.S. Sugar has suffered an injury in fact.

9.      The Corps' unlawful actions will cause irreparable injury to U.S. Sugar, as set forth herein.  U.S. Sugar's hardships, as set forth herein, outweigh the Federal Defendants' hardship in having to re-analyze the CEPP A-2 Component Authorizations consistent with the WRDA 2000 Savings Clause prior to operation of the CEPP A-2 Component and requiring the Federal Defendants to comply with WRDA 2000 is in the public interest.

10.     Defendant, the Corps, is a federal agency under the United States Department of Defense. The Corps carries out projects that provide coastal protection, flood protection, hydropower, navigable waters and ports, recreational opportunities, and water supply. The Jacksonville District is a civil works district in the Corps. The Jacksonville District manages projects associated with the Lake and Everglades watersheds on behalf of the Corps.

11.     The Corps' authority to implement CERP, including the CEPP A-2 Component, comes from congressional authorizations, including WRDA 2000.  The Corps' authority is limited to the authority granted to it by Congress.

12.     Defendant, Christine E. Wormuth, is the Secretary of the Army. Christine E. Wormuth is sued in her official capacity.  The Secretary of the Army is authorized in section 324 of the Water Resources Development Act of 2020, Pub. L. No. 116-260 ("WRDA 2020"), section 1308 of America's Water Infrastructure Act of 2018, Pub. L. No. 115-270 (132 Stat. 3819) ("WRDA 2018"), and section 1401(4) of the Water Infrastructure Improvements for the Nation Act, Pub. L. No. 114-322 (130 Stat. 1713) ("WRDA 2016") to implement the CEPP A-2 Component.  The Secretary of the Army also completed a report known as the Section 1308(b) of Water Resources Development Act of 2018 Report to Address Concerns, Recommendations, and Conditions Identified in the Assistant Secretary of the Army for Civil Works (ASA(CW)) Review Assessment in accordance with WRDA 2018.

13.     Defendant, Jaime A. Pinkham, is the Assistant Secretary of the Army (Civil Works). Jaime A. Pinkham is sued in his official capacity.  The Assistant Secretary of the Army (Civil Works) executed the August 31, 2015 Record of Decision, the May 15, 2020 Record of Decision, and the PPA, which are part of the CEPP A-2 Component Authorizations.

14.     Defendant, Lieutenant General Scott A. Spellmon, is the Commanding General and Chief of Engineers for the United States Army Corps of Engineers. Lieutenant General Scott A. Spellmon is sued in his official capacity. The Chief of Engineers executed the Chief's Report that is incorporated in the 2015 CEPP EIS and is part of the CEPP A-2 Component Authorizations.

15.     Defendant, Colonel Andrew D. Kelly, is the Commanding District Engineer for the United States Army Corps of Engineers, Jacksonville District, is in charge of the United States Army Corps of Engineers, Jacksonville District office in Jacksonville, Florida and is designated to act for the Secretary of the Army. Colonel Andrew D. Kelly is sued in his official capacity. The U.S. Army District Commander executed the April 17, 2020 Record of Decision, which is part of the CEPP A-2 Component Authorizations.

## JURISDICTION AND VENUE

16.     This action arises under the Federal Declaratory Judgment Act, 28 U.S.C.A. §§ 2201 and 2202, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the APA, 5 U.S.C. §§ 701-706.

17.     This Court has subject matter jurisdiction pursuant to 5 U.S.C. §§ 701-706 (APA judicial review provisions) to determine whether Defendants acted arbitrarily, capriciously, with an abuse of discretion, and otherwise not in accordance with law; 28 U.S.C. § 1331 (federal question) because this action arises under the laws of the United States; and 28 U.S.C. § 1361

(action in the nature of mandamus to compel an officer or employee of the United States or agency thereof to perform a duty owed to Plaintiff).

18.     Relief is appropriate pursuant to 5 U.S.C. § 701 et seq. (APA); and 42 U.S.C. 4321 (NEPA).

19.     Declaratory relief is appropriate under 5 U.S.C. § 706 because an actual controversy exists between Plaintiff and Defendants.

20.     Venue lies in this judicial district by virtue of 16 U.S.C. § 1540(g)(3)(A) (allowing "any person" to commence a civil suit on his own behalf) and 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims set forth in this Complaint occur within this judicial district, and Defendants, having authority over the actions or inactions alleged, are located in this judicial district.  The CEPP A-2 Component is being constructed in this judicial district, in Palm Beach County. U.S. Sugar's substantial farming operations occur in Palm Beach County, within this judicial district.

21.     The federal government has waived sovereign immunity in this action pursuant to 16 U.S.C. § 1540(g) and 5 U.S.C. § 702.

22.     U.S. Sugar has exhausted all administrative remedies available to it as required by the APA.

23.     All conditions precedent, if any, have been satisfied, waived, or are futile.

24.     The Corps' approval of the projects disputed in this Complaint is final agency actions reviewable under the APA.

## GOVERNING LAW

**WRDA 2000 and the CERP Savings Clause**

25.     WRDA 2000 is the law passed by Congress on December 11, 2000, that approved

and established the legal framework for CERP.  Water Resources Development Act of 2000, Pub.

L. No. 106-541.

26.     WRDA 2000 authorized the Corps to implement multiple projects in accordance

with this law and make changes to operational plans designed to restore the Everglades.

27.     WRDA 2000 is based on the work contained in the Central and Southern Florida

("C&SF") Comprehensive Review Study Final Integrated Feasibility Report and Programmatic

Environmental Impact Statement, dated April 1999, which was adopted by a Record of Decision

dated July 1, 1999.  This report is known as the Restudy or the Yellow Book.

28.     WRDA 2000 mandated that the Corps protect Florida's water supply in existence

at the time WRDA 2000 was adopted, as a condition of implementing CERP projects, such as

CEPP and its components.  WRDA 2000 § 601(h)(2)(A) and (h)(4).

29.     At issue in this Complaint is the Corps' failure to comply with that provision in

WRDA 2000, referred to as the "CERP Savings Clause", as it implements CEPP.  The CERP

Savings Clause provides:

> (5) SAVINGS CLAUSE.—
> (A) NO ELIMINATION OR TRANSFER.—Until a new source of water supply
> of comparable quantity and quality as that available on the date of enactment of
> this Act is available to replace the water to be lost as a result of implementation of
> the Plan, the Secretary and the non-Federal sponsor shall not eliminate or transfer
> existing legal sources of water, including those for—
> (i) an agricultural or urban water supply;
> (ii) allocation or entitlement to the Seminole Indian Tribe of Florida under section
> 7 of the Seminole Indian Land Claims Settlement Act of 1987 (25 U.S.C. 1772e);
> (iii) the Miccosukee Tribe of Indians of Florida;
> (iv) water supply for Everglades National Park; or
> (v) water supply for fish and wildlife.

S. 601(h), WRDA 2000, Pub. L. No. 106–541, December 11, 2000, 114 Stat 2572.

30.     The CERP Savings Clause protected entities such as U.S. Sugar, by assuring them that their water supply, existing on the date WRDA was enacted,  December 11, 2000 ("the WRDA 2000 Baseline"), would not be eliminated by the Corps' implementation of any CERP project, including CEPP.

**The Central Everglades Planning Project**

31.     CEPP is a project within the CERP plan to restore the Everglades.  CEPP consists of various components.

32.     The purpose of CEPP is "to improve the quantity, quality, timing and distribution of water flows to the Northern Estuaries, central Everglades … and Florida Bay while increasing water supply for municipal and agricultural users."  *See* 2015 CEPP EIS, at ES-1.

33.     Today, CEPP consists of the CEPP A-2 Component and additional components including backfilling an existing canal, degrading existing levees, moving water in Water Conservation Area 3 through the construction of a levee and the addition of culverts, increasing the capacity of a pump station, and installing a groundwater seepage barrier.  For purposes of this Complaint, the key component is the CEPP A-2 Component.

34.     The predecessor to CEPP was referred to as the EAA Storage Reservoir Project. It was one of the first CERP projects to begin construction, until environmental groups filed a federal lawsuit to stop the project, resulting in years of delay.[1]

35.     Due to this lawsuit, the EAA Storage Reservoir project was converted into State-owned infrastructure known as the "A-1 Flow Equalization Basin", which is a shallow feature

---

[1] *Natural Resources Defense Council v. Antwerp*, Case No. 07-80444-CIV-Middlebrooks, 2007 WL 1958013 (S.D. Fla., May 23, 2007).

intended to hold and more evenly distribute water to the Stormwater Treatment Areas ("STAs"). The A-1 Flow Equalization Basin was incorporated into the State's program for achieving water quality requirements, referred to as "Restoration Strategies."

36.     Following the resolution of the lawsuit, the Corps started implementing CEPP by issuing the 2015 CEPP EIS.

37.     In March 2018, certain design changes were made to the CEPP design.  These changes were documented in a Section 203 Post Authorization Change Report Integrated Feasibility Study and Draft EIS and Addendum (the "PACR").

38.     Congress authorized the revised design for the CEPP A-2 Component in America's Water Infrastructure Act of 2018. Pub. L. No. 115-270, October 23, 2018, 132 Stat. 3765 ("WRDA 2018").

39.     On January 24, 2020, the Corps issued a Final Environmental Impact Statement for the CEPP A-2 Component which includes the approved changes.

40.     On April 17, 2020, the Corps issued a Record of Decision and Section 404 of the Clean Water Act permit to allow the local sponsor, the South Florida Water Management District, to begin construction work on the A-2 STA.

41.     In the April 17, 2020 Record of Decision, the Corps acknowledged that the A-2 STA "was designed to function with the [EAA] reservoir," but left open the possibility that the A-2 Reservoir would not be constructed. *See* April 17, 2020 Record of Decision at 5 ("**If** the Corps constructs the proposed A-2 Reservoir…") (emphasis added).

42.     On May 15, 2020, the Corps issued a second Final Environmental Impact Statement for the Central and Southern Florida, Everglades Agricultural Area (EAA) Reservoir and Stormwater Treatment Area (STA), Florida and final Record of Decision ("May 2020 FEIS"). This

May 2020 FEIS addresses construction of the A-2 Reservoir and the A-2 STA, *i.e.* the CEPP A-2 Component.

43.     The May 2020 FEIS adopted the A-2 Reservoir and A-2 STA components from the PACR, along with the other CEPP project components, and modified the design to include the addition of a secondary seepage canal and other design modifications that the Corps described as minor.

44.     The May 2020 FEIS conceded that the project was authorized in accordance with WRDA 2000.  May 2020 FEIS, Record of Decision at 1 ("Congress authorized the project….in accordance with section 601 of the Water Resources Development Act of 2000…").

45.     The May 2020 FEIS serves as the NEPA document for the Corps' decision to issue the A-2 STA Permit.  The A-2 STA Permit authorized dredging and filling federal wetlands for the purpose of constructing the A-2 STA.

46.     On or about April 30, 2021, the Corps and South Florida Water Management District entered into the PPA that governs the two agencies' responsibilities for building and operating the CEPP A-2 Component.

47.     The PPA provides that CEPP is subject to the May 2020 FEIS, which had acknowledged the need for Savings Clause compliance.

48.     The following documents each constitute final agency action and are subject to review under the APA.  These documents and the environmental documents incorporated into them, are collectively referred to herein as the CEPP A-2 Component Authorizations:

    a.   2015 CEPP EIS (including its Record of Decision);

    b.   2018 PACR;

    c.   April 17, 2020 Record of Decision supporting the A-2 STA Permit;

      d.  May 2020 FEIS (including its Record of Decision); and

      e.  PPA.

49.     By implementing CEPP (which includes the CEPP A-2 Component), without adhering to the Savings Clause, the Corps has violated WRDA 2000.

**The Corps' Violates the WRDA 2000 Baseline by Improperly Substituting it with a 2008 Baseline**

50.     The CEPP A-2 Component includes the A-2 Reservoir which will be 23 feet deep and have a 240,000 acre-foot capacity,[2] and the A-2 STA which will be 6,600 acres, composed of 3,600 acres on the existing planned Flow Equalization Basin footprint and an additional 3,000 acre expansion.  It will have 6,500 acres available to treat water from the A-2 Reservoir before flowing south.

51.     Treating water occurs through the natural removal by plants of nutrients, mainly phosphorous, as water flows past.

52.     The CEPP A-2 Component was studied and modeled to operate with several other previously constructed STAs to maximize volumes stored and conveyed. May 2020 FEIS at ES-3, 1-7, and 3-22.

53.     Construction of the A-2 STA is currently underway and scheduled to begin a "grow-in" phase for the vegetation in 2023 that will require water.

54.     The A-2 STA is scheduled to begin water treatment operations in 2025.

55.     The A-2 Reservoir lags behind the A-2 STA in construction, and is currently scheduled for completion in 2027, with operational testing anticipated to last until 2029.

---

[2] For reference, one acre-foot (i.e., an acre of water one foot deep) is equal to 325,851 gallons.

56.     Without the A-2 Reservoir, water for the A-2 STA will come from the Lake. May 2020 FEIS at 1-2, 3-22 and 5-6.  The water from the Lake that will be diverted to the A-2 STA is water being transferred away from urban and agricultural entities such as U.S. Sugar.

57.     The May 2020 FEIS does not commit that, once constructed, the Corps intends to provide the required water supply benefits from the A-2 Reservoir, despite the original requirement to do so.  May 2020 FEIS at 3-22, 3-7, 3-8, 3-14, and 3-19.

58.     In contrast, the May 2020 FEIS contains the vague statement that: "Water Supply – Additional water supply *may* be available for agricultural/municipal water supply with CEPP New Water Modification, but the purpose of the Reservoir is environmental restoration and water supply for the environment receives first priority."  May 2020 FEIS, at ES-5 (emphasis added).

59.     The Savings Clause applies to the CEPP A-2 Component, including the A-2 STA and A-2 Reservoir, whether operated together as originally planned, or operated independently, under the new plan.  *See, e.g.*, May 2020 FEIS at 1-7. The Corps failed to properly apply the Savings Clause in all the CEPP A-2 Component Authorizations.

60.     The Corps regulations require that CERP projects do not transfer or eliminate existing sources of water compared to the WRDA 2000 Baseline.  These regulations require "comparing the availability of water with the recommended project with the pre-CERP baseline [i.e., the WRDA 2000 Baseline]."  33 C.F.R. § 385.36(a).

61.     For the reasons noted in this Complaint, the Corps eliminated and transferred existing legal sources of water from U.S. Sugar and other entities contemplated in WRDA 2000.

62.     The Corps is implementing CEPP, including the CEPP A-2 Component, without applying the mandated Savings Clause protections in WRDA 2000.

63.     In implementing CEPP, the Corps disregards the clear language in the Savings Clause which requires them to protect the WRDA 2000 Baseline water supply.

64.     The existing legal water supply sources available on the date of WRDA 2000 included Lake Okeechobee under the management regulations in place at the time known as the "Water Supply and Environment" Lake Regulation Schedule or "WSE."[3]

65.     The WSE schedule provided sufficient supply to fulfill the water rights of Florida's water permittees.[4]

66.     Instead of using the WRDA 2000 Baseline, the Corps uses a different water supply baseline, one in existence in 2008.

67.     The 2008 baseline is unfavorable to U.S. Sugar and all other entities who depend on water, when compared to the WRDA 2000 Baseline because the lake was managed at a lower level (i.e. less water in Lake), instead of the WRDA 2000 Baseline.

68.     In essence, the Corps disregards the WRDA 2000 Baseline, and unilaterally replaces it with the undesirable 2008 baseline.

69.     The 2008 baseline was not supposed to be  in place longer than it took the Corps to repair the Herbert Hoover Dike surrounding the Lake ("HHD"), ostensibly three years, but the CEPP A-2 Component Authorizations demonstrate that the Corps now intends the 2008 baseline to become the permanent baseline for all future CERP components.  For water supply purposes, HHD repairs are effectively complete.

---

[3] United States Army Corps of Engineers Record of Decision approving the Lake Okeechobee Regulation Schedule Study, WSE, as described in the Final EIS, July 7, 2000; Errata to the Final Environmental Impact Statement (FEIS) for Lake Okeechobee Regulation Schedule Study and Annex A, March 31, 2000 and Final Environmental Impact Statement for Lake Okeechobee Regulation Schedule Study, November 1999.
[4] South Florida Water Management District Lower East Coast Water Supply Plan, 2005 – 2006 Update, at 31 and 35.

70.     The reduction of water caused by the Corps' reliance on the 2008 baseline instead of the WRDA 2000 Baseline amounts to approximately one foot less water stored in the Lake, which translates into approximately half a million acre-feet.

71.     Reductions in water supply of this magnitude create numerous problems for U.S. Sugar.  Like all farmers, U.S. Sugar must water its crops. To do this, U.S. Sugar must obtain permits authorizing its use of water.

72.     U.S. Sugar's water requirements, recognized in valid and longstanding state permits, are based on the water available in the WRDA 2000 Baseline, not the 2008 baseline.

73.     This elimination of water, caused by the use of the 2008 baseline, increases the risk of permanent damage to U.S. Sugar's land and the inability to reliably and adequately water its crops.

74.     Under low water conditions, soil and organic matter oxidize resulting in soil subsidence.  At low Lake levels, there is an inability to deliver water to the farm fields, plants die, and soil subsidence and risk of wildfire are increased. These potential environmental harms affect U.S. Sugar as a landowner and nearby landowners.

75.     The Federal Defendants have repeatedly failed to use the requisite WRDA 2000 Baseline in the CEPP A-2 Component Authorizations, instead substituting the unfavorable 2008 baseline in its place, thereby eliminating or transferring the water supply of urban and agricultural entities that existed on the enactment of WRDA 2000.

**The Corps' Violation of NEPA**

76.     The Corps' NEPA analysis as expressed in the CEPP A-2 Component Authorizations is flawed for three fundamental reasons.  First, it relies on the wrong water supply baseline in violation of WRDA 2000, as described above.  Second, the Corps' water quality analysis is so

incomplete that it fails to effectively evaluate the CEPP A-2 Component.  Third, the CEPP A-2 Component Authorizations treat the A-2 STA and the A-2 Reservoir as a single, integrated component, when in reality, these two features will not be operated together anytime soon, according to the Corps.

*Incorrect Water Supply Baseline*

77.   For the reasons provided earlier, the Corps is required to use the WRDA 2000 Baseline when evaluating water supply impacts.  The Corps' NEPA analysis is flawed because it fails to analyze the effect on water supply to urban and agricultural water entities using the WRDA 2000 Baseline mandated by WRDA 2000.

78.   This issue was squarely before the Corps during the NEPA process as raised in the public comment process. *See* 2015 CEPP EIS, Appendix C.3; May 2020 FEIS, Appendix C.

*Incomplete Water Quality Analysis*

79.   The Corps' water quality evaluation in the CEPP A-2 Component Authorizations is incomplete and flawed.

80.   Numerous water quality requirements exist downstream of the CEPP A-2 Component.  The State of Florida adopted a 10 parts per billion standard for phosphorus that applies in the water conservation areas.  *See* 62-302.530(4), Fla. Admin. Code.  The State has not achieved that standard to date.  May 2020 FEIS at 3-20.

81.   In addition, the State remains under a federal Consent Decree requiring it to achieve water quality requirements in Everglades National Park and the Loxahatchee National Wildlife Refuge.  *See United States v. South Florida Water Management District*, 847 F.Supp. 1567 (S.D. Fla. 1992).

82.   The May 2020 FEIS does not accept the State's assessment in the PACR of water quality compliance with federal standards.

83.   The May 2020 FEIS states that "there remains a level of uncertainty regarding the model results (risk whether the project will be able to meet water quality standards as noted by the non-federal sponsor in the [PACR]), which are being used to show that project benefits will be achieved once constructed."  May 2020 FEIS at 4-24; *see also* May 2020 FEIS at ES-5 ("There is a continued need to resolve concerns relative to the water quality compliance aspects and the operations and maintenance requirements, to validate the benefits being claimed and the water quality improvement effectiveness and efficiency.").

84.   Part of the CEPP A-2 Component purpose is to restore the Everglades, which would be undermined if it cannot achieve water quality compliance needed for restoration.

85.   The May 2020 FEIS states that "the project remains at 'risk' for not achieving project benefits or functionality as designed/proposed ...."  May 2020 FEIS at 4-24.

86.   Because of this risk of not achieving water quality standards, the Corps has improperly failed to analyze whether the CEPP A-2 Component can operate in a way that will achieve the habitat restoration benefits explained in the May 2020 FEIS that are the basis of the project purpose.  *See* PACR at ES-11 (regarding costs).

87.   The Corps' NEPA analysis is insufficient because it does not have the information necessary to make a reasonable choice among the alternatives and cannot determine whether the CEPP A-2 Component will be able to operate because it may not meet water quality standards.

88.   The CEPP A-2 Component benefits are predicated on the A-2 Reservoir using other STAs to achieve water quality standards, in addition to the A-2 STA.  May 2020 FEIS at 3-3 (stating interdependence of the A-2 Project formulation with other STAs).

89.     Without the ability to operate together with other STAs as described, the A-2 Reservoir will not be able to discharge sufficient volumes of water to achieve the expected benefits of the A-2 Reservoir, making the Corps cost/benefit analysis inaccurate.  *See* May 2020 FEIS at ES-5 (explaining that the A-2 Reservoir was originally screened out of CEPP due to cost, but the PACR was prepared by the South Florida Water Management District without regard to cost); May 2020 FEIS at 4-24 (noting that the risk of not achieving water quality standards could result in "higher than anticipated costs to operate at partial or full capacity.").

90.     The operational constraint was added only in the Record of Decision and not included in the hydrologic analysis provided to the public for comment.

91.     The operational constraint is an unstudied significant change to the expected function of the CEPP A-2 Component and its effects on the human environment.

92.     The Corps was required to prepare a Supplemental Environmental Impact Statement ("EIS") with hydrologic modeling results based on the operational constraint but failed to do so.

93.     The Corps' NEPA analysis is flawed for not providing sufficient information about whether the CEPP A-2 Component will be able to achieve water quality standards and consequently be able to operate as intended, when the costs of developing such information is not unreasonable.

94.     This issue was squarely before the Corps during the NEPA processes as raised in the public comment process. *See* 2015 CEPP EIS, Appendix C.3; May 2020 FEIS, Appendix C.

*Incorrect Evaluation of the CEPP A-2 Component as a Single Unit*

95.     The Corps incorrectly studied only alternatives that included the A-2 Reservoir and A-2 STA as a single unit.

96.     The Corps is now allowing the A-2 Reservoir and A-2 STA to operate independently of each other and independently from Florida's other, existing STAs.

97.     The May 2020 FEIS, however, did not analyze Savings Clause compliance if only the A-2 STA was built or is operated independently from the A-2 Reservoir.

98.     The impacts associated with the A-2 STA as a stand-alone feature on water supply and the environment were not considered in the Corps NEPA analysis.

99.     The Corps failed to revise the May 2020 FEIS to account for this major revision to the CEPP A-2 Component.

100.    The operating plan for a standalone A-2 STA would likely require additional water from the Lake during dry periods to remain functional, which would have a significant, unstudied effect on water supply and those entities dependent on it.

101.    The effects of the CEPP A-2 Component with these limited operations will both reduce planned benefits and impair the authorized multiple purposes of serving other water-related needs of the region and additional ecological benefits to the estuaries and Everglades.

102.    A standalone A-2 STA alternative was never analyzed in the NEPA analysis for public review.

103.    This issue was squarely before the Corps during the NEPA process as raised in the public comment process. *See* May 2020 FEIS, Appendix C.

104.    The Corps was required to prepare a Supplemental EIS including hydrologic modeling of the A-2 STA as a stand-alone feature based on the significant effect on the environment, but failed to do so.

105.     By unlawfully deciding to independently operate the CEPP A-2 Component from the rest of Florida's STA infrastructure, the Corps turned a multipurpose, integrated project into a single purpose, segregated project, with no analysis of the effects.

106.     The Corps overrode the operational refinements that resulted in the CEPP A-2 Component performing well, *i.e.* the Corps eliminated the multipurpose operational benefits in favor of a single purpose, storing only the water that can be treated and released to applicable standards for benefits determined essential to Everglades restoration.

107.     The Corps' decision to change the CEPP A-2 Component without modeling or allowing public comment was unlawful under NEPA and undermined the cost-benefit analysis that served as the basis for the preferred alternative.  The basis for Congressional approval in WRDA 2018 and WRDA 2020 is undercut by removing the operational refinements.

## CLAIMS FOR RELIEF

Count 1:  Declaratory Judgment - Interpretation of WRDA 2000

108.     Plaintiff realleges and incorporates paragraphs 1 to 107.

109.     WRDA 2000, section 601(h)(5) states:

(5) SAVINGS CLAUSE. —
(A) NO ELIMINATION OR TRANSFER.—Until a new source of water supply of comparable quantity and quality as that available on the date of enactment of this Act is available to replace the water to be lost as a result of implementation of the Plan, the Secretary and the non-Federal sponsor shall not eliminate or transfer existing legal sources of water, including those for—
(i) an agricultural or urban water supply;
(ii) allocation or entitlement to the Seminole Indian Tribe of Florida under section 7 of the Seminole Indian Land Claims Settlement Act of 1987 (25 U.S.C. 1772e);
(iii) the Miccosukee Tribe of Indians of Florida;
(iv) water supply for Everglades National Park; or
(v) water supply for fish and wildlife.

S. 601(h), WRDA 2000, Pub. L. No. 106–541, December 11, 2000, 114 Stat 2572.

110.     The date of enactment of WRDA 2000 is December 11, 2000.

111.    Congress explicitly and unambiguously required that implementation of the CERP plan required the Corps and the non-Federal sponsor (South Florida Water Management District) not to eliminate or transfer existing legal sources of water that were available as of December 11, 2000, without making another supply source of comparable quality and quantity available.

112.    On December 11, 2000, the existing legal sources of water included the water supply available through the then-existing Lake schedule, referred to as WSE.

113.    Congress did not authorize any exceptions to the Savings Clause because it sought to preserve the water supply sources that existed as of December 11, 2000, at least until implementation of the Plan resulted in a new source of water of comparable quantity and quality.

114.    Notwithstanding the plain language, the Corps disregarded the WRDA 2000 directive as allowing it to implement the CEPP A-2 Component without comparing the water supply as of the WRDA 2000 Baseline.

115.    Implementation of the CEPP A-2 Component as modeled fails to restore water supply that is lost from implementation of the Plan and is woefully deficient.

116.    U.S. Sugar is one of the agricultural entities contemplated in WRDA 2000.

117.    Accordingly, U.S. Sugar is entitled to declaratory judgment pursuant to 28 U.S.C.A. §§ 2201 and 2202 against the Federal Defendants.  There exists an actual dispute and controversy between the parties which cannot be resolved absent declaratory relief by this court. Additional CERP projects will be implemented, and direction is needed.

118.    Declaratory judgment in the manner sought would terminate the uncertainty and breach of statutory duties by the Federal Defendants.  U.S. Sugar is entitled to declaratory judgment, declaring the rights and legal relations of the parties as follows:

a.  Federal Defendants' interpretation of WRDA 2000 is contrary to its plain language and the expression of Congressional intent.

b.  WRDA 2000 requires implementation of a CERP project not eliminate sources available as of December 11, 2000.

c.  The CEPP A-2 Component Authorizations do not comply with WRDA 2000.

d.  Future CERP authorizations must comply with WRDA 2000.

e.  U.S. Sugar is entitled to declaratory judgment and other relief as is just, equitable, and proper.

Count 2:  The Corps' Violation of WRDA 2000

119.    Plaintiff realleges and incorporates paragraphs 1 to 118.

120.    As explained above, in WRDA 2000, Congress directed the Corps to protect the water supply of existing entities dependent on that water supply, such as U.S. Sugar, as it implements CERP.  By its plain language, WRDA 2000 requires that until a new source of water supply of comparable quantity and quality as that available on the date of enactment of WRDA 2000 to replace the water to be lost as a result of implementation of CERP, the Corps and non-Federal sponsor shall not eliminate or transfer the WRDA 2000 Baseline.

121.    The CEPP A-2 Component Authorizations must comply with the plain language of the Savings Clause.

122.    In implementing CEPP, including most recently the CEPP A-2 Component, as reflected in the CEPP A-2 Component Authorizations, the Corps has unlawfully ignored WRDA 2000's requirement to use the WRDA 2000 Baseline.  By using the lesser amount of water that existed in 2008 as a baseline, the Corps has violated WRDA 2000.

123. The CEPP A-2 Component Authorizations are therefore arbitrary, capricious, and not in accordance with WRDA 2000, in violation of the APA, 5 U.S.C. § 702, § 703, § 706(2)(A).

Count 3: The Corps' NEPA Review Violates NEPA and the APA – Failure to Prepare an Adequate EIS for the CEPP A-2 Component

124. Plaintiff realleges and incorporates paragraphs 1 to 123.

125. The Corps' NEPA analysis, as reflected in the CEPP A-2 Component Authorizations, was predicated on the 2008 baseline instead of the WRDA 2000 Baseline, and therefore failed to correctly analyze the impact of the CEPP A-2 Component on water supply. Despite having failed to undertake this analysis, the Corps is proceeding with construction of the A-2 STA.

126. The Corps' failure to study the impacts of operating the A-2 STA without analyzing the effect of such operation on water supply using the WRDA 2000 Baseline under the WRDA 2000 Savings Clause is significant.

127. Such an analysis would reveal that the A-2 STA cannot be operated consistently with the WRDA 2000 Savings Clause.

128. The CEPP A-2 Component Authorizations do not resolve whether the CEPP A-2 Component can be operated as planned and comply with water quality requirements. Because of this significant unresolved risk, the May 2020 FEIS is flawed for not including the reasonably foreseeable adverse impacts associated with the CEPP A-2 Component.

129. In addition, the CEPP A-2 Component Authorizations violate NEPA because the Corps failed to analyze the effects on the human environment of operating the A-2 STA years before operating the A-2 Reservoir, or operating the A-2 STA without constructing the A-2 Reservoir at all. None of the alternatives in the CEPP A-2 Component Authorizations included a

standalone A-2 STA.  The Corps illegally authorized a project alternative that was never studied or modeled in the NEPA process and was never presented for public comment.

130.    The Corps' CEPP A-2 Component Authorizations, were arbitrary, capricious, an abuse of discretion, and contrary to law, and were without observance of procedures required by law, all in violation of the APA, 5 U.S.C. § 702, § 703, § 706(2)(A), and NEPA, 42 U.S.C. § 4332(A), 40 C.F.R. Part 1500 (2019).

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment for the Plaintiff and provide the following relief:

A.    A declaration and order that WRDA 2000 requires the Federal Defendants to apply the Savings Clause by comparing implementation of each CERP Project with the WRDA 2000 Baseline of December 11, 2000.

B.    A declaration and order that the Corps' interpretation of WRDA 2000 in CEPP A-2 Component Authorizations is inconsistent with the plain language of WRDA 2000.

C.    A declaration and order that the Corps' CEPP A-2 Component Authorizations violate the APA, WRDA 2000, and NEPA.

E.    Remand the CEPP A-2 Component Authorizations to the Corps for review consistent with NEPA and the WRDA 2000 Savings Clause.

F.    Enjoin the Corps from operation of the CEPP A-2 Component, until such time as the CEPP A-2 Component Authorizations are no longer in violation of the APA, WRDA 2000, or NEPA.

G.    Award U.S. Sugar its attorneys' fees and costs.

H.    Award any supplemental relief as this Court deems just and appropriate.

Dated: August 26, 2021

Respectfully submitted,

*/s/ Gregory M. Munson*

**GREGORY M. MUNSON**
Florida Bar No. 188344
GUNSTER, YOAKLEY & STEWART, P.A.
215 South Monroe Street, Suite 601
Tallahassee, Florida 32301
Primary email: gmunson@gunster.com
Secondary email: mmcleod@gunster.com,
rfrazier@gunster.com and
eservice@gunster.com
Telephone: 850-521-1980
Facsimile: 850-576-0902

**DEBORAH K. MADDEN**
Florida Bar No. 0098816
GUNSTER, YOAKLEY & STEWART, P.A.
Las Olas Centre
450 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, Florida 33301
Primary email: dmadden@gunster.com
Secondary email: mmcleod@gunster.com,
gmorales@gunster.com and
eservice@gunster.com
Telephone: 954-462-2000
Facsimile: 954-523-1722

**LUNA E. PHILLIPS**
Florida Bar No. 0063673
GUNSTER, YOAKLEY & STEWART, P.A.
Las Olas Centre
450 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, Florida 33301
Primary email: lphillips@gunster.com
Secondary email: mmcleod@gunster.com,
gmorales@gunster.com and
eservice@gunster.com
Telephone: 954-462-2000
Facsimile: 954-523-1722

*Attorneys for United States Sugar Corporation*